May I please the court? My name is Kwok Pham. I represent the appellants. D.R. who deceased in care of Contra Costa DCFS. The mom is here sitting at the side bench and the father cannot be here because he's out of state on a work assignment. May I start now? Please. Yes. So this case arose from a dependency case in Contra Costa County. The county seized the child from the grandma whom the mom asked to take care of the child because the mother could not take care of the child because she was indigent and homeless. The county seized the child without a warrant, then put the child in the foster, actually two foster homes. The first foster home very briefly and then in the second foster home would turn out to be a very dangerous environment for the child. The foster parents used a docker tot and engaged on a swaddling practice even though the child could turn over on her own. Let me ask you this counsel. First of all let me let me say I'm sure I speak for my colleagues as well this is a very tragic tragic case and certainly our sympathies are with the loved ones as to the incident but we're here on legal issues and this is a third amended complaint right so you've had a couple of opportunities to amend here correct? Yes. And the complaint is really internally inconsistent. So on the one hand on the one hand there are allegations that Miss L knew of the danger of the docker tot and knew that the baby had managed to roll over and I suppose the argument is that there's an indication that we you know put those facts together that the danger would be known or anticipated to Miss L and and that that might lead to a deliberate indifference claim. But on the other hand there's also allegations that defendant Miss L and I'm looking at paragraph 96 ER 0795 of the complaint that Miss L failed to notice that there was a docker tot in the home and there's also allegations that she could have noticed not that she did notice. So what do we do with all of those internal internally inconsistent and very very conclusory allegations in the complaint in light of the plausibility pleading standard under Twombly and Iqbal? Yes I mentioned the underlying case because I think the court should know that it is very difficult to know what's going on in what happens in the pendency court because of welfare institution code. I'm doing the pendency case because everything is shrouded in secrecy and confidentiality. Okay so at the state of pleading we have certain evidence that point to a possibility of deliberate indifference. I appreciate that but we still have to apply the standard that there has to be facts to plausibly support the claim. Yes. Right and so on the one hand you there's a some conclusory allegations that may support that at least for purposes of 12b6 but then there are contradictory like flat-out contradictory facts alleged as well. How do we reconcile that and reach the conclusion that these are plausible claims? Yes it's not totally contradictory. You mentioned that the misdemeanor failed to notice and and you have the court need to understand that because of the vulnerability of a infant baby the social worker has a heightened duty to inspect the home okay and every corner of the home every room okay in this case she's just went to one room and so that's grossly negligent behavior right she should have expected inspected every room but didn't and didn't go into the room where the doctor taught was is that what you're saying it's I think it's a modern gross negligence later on we found out that there was spoliation evidence that very very disturbing of course the defendant will never admit that you know they deliberately ignored the danger but in this case they went in and then modified the record for the first time inspections and we believe that it was very strange because usually the social course it's like a better medical record. Counselor, I want to follow up on Justin Nguyen's question and I'm going to be asking the same question to your friend and I'm going to highlight some of the same paragraphs that Judge Nguyen did. In paragraph 96 you say defendant Meisel as the case social worker failed to notice that Frannich had a docketot. In paragraph 232 you allege Meisel knew one month before the death that the docketot was used at the foster home. You're here as an officer of the court. Are you telling us that you are alleging in the complaint that Ms. Meisel knew before the death that a docketot was being used that the child was being swaddled in the docketot or are you saying no she should have known but she didn't? No, that's probably a mistake that the statement that she knew a month ahead of time that the docketot. We want to allege it, our intention to allege that about a month before the death she knew that the baby was swaddled and could turn over. That by itself indicates a danger. But she didn't know that there was a docketot at the home? Or you don't have any information? I don't have any information at that time and it took quite a while to figure that one out. Also say in paragraph 231 alternatively Meisel knew of but recklessly disregarded the danger of the docketot of the tight swaddling of her unsupervised sleep in the docketot while being swaddled tightly. So you seem to be alleging that Meisel knew that the baby was swaddled and was sleeping in the docketot. Yes, that was speculation. It's speculation? Well, from the, we don't have the full picture. From the coronary report we knew that the docketot was involved. And from the report to the dependency court we knew that a swaddling was all the time. So we put things together and although she may or may not know the docketot, I think we have evidence that point to that she knew of the docketot but the docketot was spoliated, concealed, covered up, destroyed. We knew for sure that she knew that swaddling was used. What evidence, even if, why don't you tell us, what evidence do you have and we can look at whether it's in the record or not. What evidence do you have that Meisel knew there was a docketot in the foster home? We don't have evidence at the time that she knew of the docketot. Okay, and well don't you have to prove that the actor was aware of a substantial risk of harm and then placed the injured person into that risk? Yes. In order to sustain your Eighth Amendment claim. Okay, we made the inference because the docketot was used a lot of time at the home and the social worker is supposed to inspect the home. At this particular home? Yes, yes, and I think we have, I believe we have a picture of, they even used docketot when they took the child out on a park. Did Ms. Meisel ever visit the home herself? Yes, as a duty, as a social worker, she was supposed to visit. I'm not asking you if she was supposed to. Do you have any knowledge that she actually did visit the home? Yes, she did three times. She three times went in the home at a time when you're alleging the docketot was there? That's right, yeah. But you also allege at 2.30 of your complaint that Meisel and other DCFS defendants failed to inspect the foster home and the sleeping arrangements for DR as required by state law at three regular monthly visits to the foster family home. Yes. So... Yes, there was actually three visits by Ms. Meisel. Before that, by other social workers who screened the foster home for placement. But we know definitely that Ms. Meisel visited the home three times. And what you're saying, as I understand it, in 2.30 is she was there three times but she didn't do what was required by state law when she was there. That's right, yeah. And there is very strong evidence of guilt because of all the cover-ups in the state court. Three days after the death, Meisel knew that we received a report that the child turned over and found dead face down. And there were six, at least five continuations and six hearings where Contra Costa County and Meisel hid that from the court. And at the very last moment when the coronary report came out, the county council actually tried to hide the evidence, conceal the coronary report by making that confidential on the 827. Council, I should know the answer to this question and I apologize for not being 100% sure, but were you allowed any discovery in this case? Yes, but we have run into a lot of trouble because of the 827. A lot of the delays... What discovery were you allowed in this civil case? Before reaching the allowed to look at the record, I have to file a motion called Welfare Institution Code 827 with the court for permission to take a look at the record and for permission for Contra Costa County to release the record. But eventually you got the discovery? Yes, and I took three tries and I believe at least like a year and a half. The first try is like partial record, like it's not usable. And then the second time... But at the end of the day you got additional discovery? Yes, and finally... And is there additional discovery that you think you would seek that you didn't receive? No, we received everything, but the county engaged in some kind of tactic, delay tactic. I understand that. Your time is short, so I just want to make sure that I understand that eventually you got everything that you were seeking. Yes, and then it takes some while to go to the record and figure out the strange occurrence. Did you try to take any depositions? Yes, we did. Did you take Ms. Mizell's deposition? Yes, we had to do that before we got all the record because the court imposed a certain deadline. Right, because it went to summary judgment, so by then discovery had closed and you got what you wanted. Yes, but it took us some time to figure out the spoliations of evidence. Right. Your theory is that the... And I'm sorry to say this in front of the mother, but that the baby suffocated because she was tightly swaddled and was able to flip over and the Doc-A-Tot was too soft and caused her suffocation. And then at paragraph 111 you cite the autopsy report that she had internal bleeding in her abdominal cavity and bruises to her internal organs and on the back of her head. Yes. Is that consistent with your theory of suffocation? No, no. Okay, at that time we had very sketchy evidence. We didn't know who has the record, which was the Concord Police Department. Even with the Concord Police Department, I had to pull teeth to get the information from them. They had all the photographs of the scene of death stored somewhere and they lost it and I had some expertise in computer, so I had to help them retrieve the record. And once I see the scene of death, it was damning. It was horrific. It looked like a death trap, you know, like it's a tiny bassinet. The Doc-A-Tot, I'm sure you see the picture, and all the blankets. And then from a report we figure out, through the help of Dr. O'Malu, he's a former forensic examiner, that there was indication of suffocations. I'm sorry, I forgot to ask you, did you want to save any time for rebuttal? Yes, I have five minutes for the rebuttal, if I still have. All right, you've got a minute and a half or so, so let's save that for rebuttal then. Good morning, and may it please the Court. Jason Malk on behalf of Contra Costa County and defendant Tasha Mazzel. It appears the Court was interested in the issues related to the allegations on the failure to protect. So we can start there, and as the Court astutely pointed out, the allegations in the complaint are internally inconsistent, and they don't really amount to a showing or even a plausible showing of knowledge on behalf of Tasha Mazzel as to the potential dangers that might befall DR at the foster home. Let me push back on that. So Ms. Mazzel is a trained social worker? Correct. So she's a trained social worker, and part of her job is the safety of children placed in a foster home, right? It is to inspect the home and to ensure that the foster mother is providing a safe environment, yes. And she went to the home on several occasions? At least three occasions. And the complaint, although, again, there are some inconsistencies, the complaint clearly alleges, to me at least, that she knew that there was a docketot. I'm looking at 231 and 232. She knew of the danger of the docketot. She knew of the tight swaddling. She knew of the baby's unsupervised sleep in the docketot while being swaddled tightly. And she was in the home three times, and the docketot was there, and there was publicity about the docketot being unsafe that someone in her position might be expected to know. So why is all that conclusory for deliberate indifference of allowing, not doing anything about the baby sleeping in something that is known, even by the manufacturer, to be dangerous? I don't want to recall the timing of when those issues came up, but I believe it was always prior to this incident. But I would say that what is conclusory about this and then does not amount to the deliberate indifference on the behalf of Tash Mazal is not only the internal inconsistencies, but we don't actually know the context of the child rolling over. The only time that this complaint mentions that the child rolls over is in paragraph 232. And so we don't know if that was when the child was awake. We don't know if the child was asleep. We don't know if the child was swaddled. In fact, if we look at paragraph 156 of the complaint, it says that it's difficult for a child to turn over when they're tightly swaddled. So if the child is tightly swaddled, it's difficult for them to turn over. Isn't it difficult for them to roll over and to suffocate inside the device? And then how are we supposed to put all that results? At this stage of the case where this is on a motion to dismiss, right?  Aren't we required to construe the relevant complaint, in this case if I have the number right, the third amended complaint, in the light most favorable to the plaintiff? Isn't that what our case law requires? Now we obviously have to look at Twombly and Iqbal, but don't we have to construe the complaint in the light most favorable to plaintiff? That's correct, Your Honor. So doing that, why isn't, we know what the autopsy report said, there's a known danger out in the community from this instrumentality. We know the instrumentality was there. We know Ms. Mizell is a trained social worker and we know she was there three times and they've alleged that this is what caused the death. I mean, they may not be able to prove any of that, but why isn't that plausible? It seems to me that it's plausible. Well, we have to look at the other allegations in the complaint, specifically paragraph 96 where she does not see the docketot. Well, if we were, I'm sorry to interrupt you, but wouldn't we on paragraph 96 in the light most favorable to plaintiff, couldn't we interpret paragraph 96 as being at that one time she failed to notice as opposed to she always failed to notice, especially given 231 and 232, which says that she did notice. I believe the paragraph is not as, it's not specific as to any instance. It isn't. It isn't, but in the light most favorable to plaintiff, shouldn't 231 and 232 control? Well, the 231 and 232 are in the general cause of action. General factual allegations are contained in the front and I think that would put a precedent over what would be contained in the causes of action. Well, everything is incorporated. Right. So even if Tasha Mizzell did not see the docketot during her inspections, that is a violation of state law, which only amounts to negligence as the district court pointed out. I agree with you on that point, but again it says in 231 and 232 that she did know that the docketot was being used. The use of a docketot on its own is not a dangerous condition. I would put that forth. But with the swaddling and having the baby sleep in it, it is, right? Well, according to the complaint, if you look at paragraph 156, it's difficult for the baby to turn over when it's tightly swaddled, so is that created danger if a tightly swaddled baby is sleeping in a docketot? Is that the sort of objective risk of substantial harm that is required for pleading a deliberate indifference case against a social worker? Let me play this out procedurally just to make sure that I understand this. So now that discovery has been completed because on other claims discovery went forward, it's closed, some re-judgment happened, so I'm not saying that we will do it, but if we were to remand the deliberate indifference claim as to the allegations on Ms. Mizzell, I suppose there will be another round of summary judgment on the evidence that we have, and we don't have the benefit of doing the discovery. We don't know what's going to happen, but is that procedurally what would happen? You'd go back and then you'd run another summary judgment motion? Well, if this court would remand and then he would have to, yes, I would file a summary judgment motion based on either qualified immunity and the facts of this case as taken by the plaintiff of the deposition, Ms. Mizzell, of the deposition of Ms. Franish. Right, so you would take all of those facts, like, for example, in I guess the Herrera case, which everybody cites where I sat on the panel of, and look at the evidence and decide whether the facts support deliberate indifference, and then even if theoretically they did, whether there was any case other than a high level of generality that would have put Ms. Mizzell on notice that she was violating the Constitution? At a summary judgment stage, yes, that would be the standard, I imagine, but I don't think we have to get there because I don't think the complaint is adequate enough. When we say rolled over, all we know is that Ms. Mizzell knew that D.R. could roll over. It doesn't say that when she was asleep or when she was tightly swaddled or when she was in the docketop. Well, it does say, Mizzell knew of the danger of the docketop in 231 of the tight swaddling of the baby's unsupervised sleep in the docketop while being swaddled tightly. So it does say that. Well, it doesn't say and. It just throws a number of clauses together. Well, it says knew of the danger of the docketop of the tight swaddling of her unsupervised sleep. I mean, the fact that the paragraph doesn't have a connector in it, I don't think, detracts from looking at it in the light most favorable. It's alleging she knew all those things. So, again, this paragraph, number 231, does not mention the danger associated with rolling over, which seems to be the crux of the claim regarding the dangers of using a docketop. But that's elsewhere, I think. 232, I believe, is due. She managed to roll over on her stomach, swaddled tightly, and that the docketop was used in the foster home. But we don't know if that rollover incident was when she was awake, when she was asleep, how many times she had done it, if it was a one-off event that maybe happened while she was awake and the parents were playing with her and they just called it a rollover event that was told by, and then those facts were told to Ms. Mizzell. Was Ms. Mizzell's deposition taken? Yes, it was. Is it appropriate for us to consider the arguments of Plaintiff's Counsel regarding the length of time it took for the autopsy report and the very rapid submission of the babies to the cremation within three days of death? I don't believe that those matters were resolved on summary judgment. They're not in front of this Court. I don't believe that there was any malfeasance on the part of the coroner or any investigative body. And, in fact, the record will reflect that if this goes forward, that Ms. Mizzell got consent from the parents as stated in the summary judgment motion. But the facts are alleged in the complaint, and you chose to proceed on these counts on a motion to dismiss the complaint. I'm sorry, can you repeat that? I'm sorry. We have to take the facts in the complaint as to the autopsy, et cetera, and the speed or lack of speed, et cetera, as set forth in the complaint as opposed to later discovery when the complaint was dismissed, right? Yes, yeah. So the issue is, with the deliberate difference claim, is that what Ms. Mizzell knew prior to allegedly putting the child into a known dangerous condition where harm was likely to happen, and I don't believe that the coroner's report or what happened after that fact would pertain to Ms. Mizzell's knowledge before the event. Anything further, Counsel? No, thank you. I'll send it. Thank you. Yes, I would like to clarify the fact the child was found face down, and from the record we found out that her leg got loose and she was able to use her leg to flip over, and that is a danger of swelling when the child could turn over. In closing, I would like to draw the attention to the court that this is a very special case because of the 827 confidentiality. Right, but it is a deliberate indifference claim, and if I understand your responses today correctly, you don't have information that Ms. Mizzell knew a DACA tot was at the home. Yes, yes. She was negligent, grossly negligent, perhaps not noticing that there was one, right? With a pretty alternative because there's a good chance that she knew about it, but she didn't do anything about it, and evidence later showing that because of spoliation evidence and the standard practices that the social court must visit every home. It is a standard practice, and she said there's only one home, and she gave up on that. I think there's a strong indication of perjury right there during depositions and also in one submission to the federal court in the summary judgment stage. Right, but we're focusing on her knowledge because it's a claim of deliberate indifference. Yes. It requires a certain level of knowledge. Yes. All right, thank you. Do my colleagues have any additional questions? I want to make sure that all of their questions are answered in this difficult case. It doesn't appear that we do. Thank you very much for your argument, and thank you to the Deputy H.E. as well. The matter is submitted.
judges: NGUYEN, BENNETT, Matsumoto